# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

KIM DARBY SAENZ,

        Defendant.

No. CR 03-4089-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
RESENTENCING**

_____

## TABLE OF CONTENTS

**I. THE CONTEXT OF SUBSTANTIAL ASSISTANCE DEPARTURES** . . . . . . . 3
   **A. Sentencing In The Northern District Of Iowa** . . . . . . . . . . . . . . . . . . 4
      **1. The defendants** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      **2. The sentences** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   **B. Legal Standards For Substantial Assistance Departures** . . . . . . . . . . 10
      **1. Points of agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      **2. The point of disagreement** . . . . . . . . . . . . . . . . . . . . . . . 15
         **a. The legal flaw** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         **b. The factual flaw** . . . . . . . . . . . . . . . . . . . . . . . . . 17
   **C. The Lessons From The Sentencing Report** . . . . . . . . . . . . . . . . . 18
      **1. The range of "ordinary" substantial assistance departures** . . 18
      **2. The "reasonableness" of "starting in the middle"** . . . . . . . 20
      **3. Reorientation of perceptions** . . . . . . . . . . . . . . . . . . . . . 25

**II. SAENZ'S RESENTENCING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   **A. Background And Original Sentence** . . . . . . . . . . . . . . . . . . . . . . 30
   **B. The Decision On Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   **C. Proceedings On Remand** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      **1. Additional evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      **2. Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . . . 36
   **D. Determination Of Sentence** . . . . . . . . . . . . . . . . . . . . . . . . . . 41

|     |                                              |     |
| --- | -------------------------------------------- | --- |
| *1.* | *The appropriate procedure* .................................. | 41 |
| *2.* | *Determination of the Guidelines sentence* ............... | 42 |
| *3.* | *"Reasonableness" of the Guidelines sentence* ........... | 47 |
| *4.* | *Consideration of a non-Guidelines sentence* ............ | 48 |

***III. CONCLUSION*** ........................................... 49

With some notable exceptions, the Eighth Circuit Court of Appeals has recently reversed and remanded several of my sentencing decisions on the ground that my downward departures in excess of 50 percent for "substantial assistance" pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) were "unreasonable" and "excessive."[1] This case represents one such reversal and is now before me on remand for resentencing. With all due respect, I write to express my profound disagreement with the Circuit Court's rationale for this string of reversals. As a United States District Court Judge, I do recognize that I must faithfully and unflinchingly follow Circuit law, even when I disagree with it—as I do here. This is equally true whether the Circuit Court's

---

[1] *See United States v. Coyle*, 429 F.3d 1192 (8th Cir. 2005) (reversing a 73 percent reduction); *United States v. Saenz*, 428 F.3d 1159 (8th Cir. 2005) (reversing a 68 percent reduction); *United States v. Dalton*, 404 F.3d 1029 (8th Cir. 2005) (reversing a 75 percent reduction); *United States v. Haack*, 403 F.3d 997 (8th Cir. 2005) (reversing an 85 percent reduction), *cert. denied*, ___ U.S. ___, 126 S. Ct. 276 (2005); *but see United States v. Burns*, ___ F.3d ___, ___, 2006 WL 345850 (8th Cir. Feb. 16, 2006) (affirming a 60 percent reduction); *United States v. Pizano*, 403 F.3d 991 (8th Cir. 2005) (affirming a 75 percent reduction); *United States v. Christenson*, 403 F.3d 1006 (8th Cir. 2005) (affirming a 75 percent reduction), *aff'd by an equally divided court*, 424 F.3d 852 (8th Cir. 2005) (*en banc*).

rationale is newly-minted, as I believe it is here, or based on long-standing, rock solid precedent, as it sometimes is in other contexts. I write this opinion expressing my specific disagreement with the Circuit Court's position concerning the proper extent of substantial assistance downward departures on legal grounds as well as on the factual basis of data recently compiled by the United States Sentencing Commission to which the Circuit Court did not have access at the time that it reversed and remanded this and other cases in this string of reversals.

## I. THE CONTEXT OF SUBSTANTIAL ASSISTANCE DEPARTURES

My major point of contention with this string of reversals is the notion expressed by the Circuit Court in some of its decisions that a 50 percent reduction for substantial assistance is "extraordinary." There is, in my view, no basis for such a benchmark in federal statutory law, federal common law, the United States Sentencing Guidelines themselves, the realities of federal sentencing, or basic concepts of fairness, mercy, and justice. Indeed, recent data compiled by the United States Sentencing Commission demonstrate that labeling a 50 percent reduction for substantial assistance "extraordinary" is at odds with the facts and so deeply troubling that the Circuit Court should reevaluate its position. I will return to this point, in detail, below. However, I must first address some critical issues of context for sentencing generally and substantial assistance downward departures in particular.

### A. Sentencing In The Northern District Of Iowa

#### 1.    The defendants

First, I wish to point out the simple truth that most of the individuals I sentence in drug cases are drug addicts.  More specifically, most are methamphetamine addicts—they are users and low level dealers who deal solely to support their severe addiction.  I can go a year sentencing only methamphetamine addicts with court-appointed C.J.A. lawyers rather than privately retained lawyers, because virtually all of the methamphetamine defendants that I have sentenced are impecunious as a result of their addiction.  They are almost never drug "kingpins."  In my eleven-plus years of sentencing drug defendants, I have sentenced very few "kingpins."  The two most recent "kingpins" to appear in my court received the death penalty for murders related to their drug trafficking.  *See, e.g., United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005); *United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005).  As distinguished from the few "kingpins" to appear in my court, many "addict" defendants provide some assistance to the government in the prosecution of others.  When the government moves for substantial assistance reductions, I try to provide reasonable reductions in light of the degree of substantial assistance actually provided.

#### 2.    The sentences

I must also point out that, contrary to the perception that this string of reversals may have engendered, I am not habitually a lenient sentencer, for drug-trafficking offenses or any other kinds of offenses.  My sentencing record shows that I have not hesitated to depart or vary upward, even *sua sponte* when the government failed to seek such a departure, when I deemed it appropriate to do so, for example, in cases involving defendants who were egregiously violent, defendants whose criminal history calculations woefully under-represented their actual criminal histories (too numerous to cite

individually), or defendants for whom other factors justified an increased sentence. *See, e.g., United States v. Rouillard*, No. CR05-4068-MWB (N.D. Iowa Mar. 22, 2006) (judgment in a criminal case) (granting an upward departure under U.S.S.G. § 4A1.3 for underrepresentation of criminal history, over the government's objection, and an upward variance under 18 U.S.C. § 3553(a), also over the government's objection, from an advisory guideline range of 30 to 37 months to the statutory maximum of 120 months); *United States v. Pablo-Lepe*, No. CR 03-4102-MWB (N.D. Iowa July 23, 2004) (judgment in a criminal case) (the undersigned's first post-*Blakely* sentencing decision finding the United States Sentencing Guidelines unconstitutional and varying the defendant's sentence upward from an advisory Guidelines range of 15 to 21 months to the statutory maximum of 60 months), *aff'd*, 125 Fed. Appx. 100 (8th Cir. 2005) (unpublished op.) (*per curiam*); *United States v. Yahnke*, 297 F. Supp. 2d 1173 (N.D. Iowa 2003) (imposing an upward departure of two full criminal history categories for a criminal history category under the Guidelines that did not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant would commit other crimes, after providing the parties with notice of a potential *sua sponte* upward departure and permitting the parties to brief the issue), *aff'd*, 395 F.3d 823 (8th Cir. 2005); *United States v. Flores*, 223 F. Supp. 2d 1016 (N.D. Iowa 2002) (imposing a "horizontal" departure from criminal history category IV to category VI, and a six level "vertical" departure for under-representation of the seriousness of the defendant's dangerousness, propensity for violence, extensive criminal history, and proclivity for recidivism, after providing notice of intent to depart *sua sponte* and permitting the parties to brief the issue), *aff'd*, 336 F.3d 760 (8th Cir. 2003).

Moreover, according to data from the United States Sentencing Commission for fiscal year 2003, the latest such data available, the median sentence for drug-trafficking

offenses in the Northern District of Iowa is 120 months, which is not only twice the national median of 60 months for such offenses, but the highest median sentence for such offenses in the nation. This District's median sentence for drug-trafficking offenses is also well in excess of the median sentence of 84 months for such offenses for district courts in the Eighth Circuit, at least **double** the median sentence for such offenses for district courts in the First, Third, Tenth, and District of Columbia Circuits, and **triple** or **nearly triple** the median sentence for such offenses for district courts in the Second, Fifth, and Ninth Circuits.[2] Even recognizing that there are other factors involved, where this District has the highest median sentence in the nation for drug-trafficking offenses, it cannot be said that I or any other judge in this District is habitually a lenient sentencer.

Thus, the issue is not, or should not be, whether or not I am an excessively lenient sentencer. I am not. What I am is a very experienced sentencer, having sentenced over

---

[2]In comparison, the median sentences for drug-trafficking offenses in the district courts in the other Circuits are the following: First Circuit, 60 months; Second Circuit, 41 months; Third Circuit, 60 months; Fourth Circuit, 97 months; Fifth Circuit, 37 months; Sixth Circuit, 63 months; Seventh Circuit, 87 months; Ninth Circuit, 37 months; Tenth Circuit, 48 months; Eleventh Circuit, 70 months; District of Columbia Circuit, 60 months. Thus, the Eighth Circuit has the third highest median sentence for drug-trafficking offenses. Nationwide, no District has a higher median sentence for drug-trafficking offenses than the Northern District of Iowa, although there is a three-way tie in this Circuit between this District and the Southern District of Iowa and the District of Nebraska, and nationwide, there is also a tie with the Eastern District of North Carolina, the Middle District of North Carolina, the Northern District of Oklahoma, and the District of South Carolina, all of which have a median sentence for drug-trafficking offenses of 120 months, while the Southern District of Illinois is close behind, with a median sentence for drug-trafficking offenses of 114 months. The source for all of these statistics is the United States Sentencing Commission, Office of Policy Analysis, 2003 Datafile, OPAFY03. The statistics cited herein are also summarized in various tables on the United States Sentencing Commission website at www.ussc.gov/JUDPACK/JP2003.htm.

1,400 defendants to prison, where the vast majority of those defendants were sentenced for drug-trafficking crimes.[3] This is no surprise, given that our District had the sixth highest criminal caseload per judge in the nation for 2001 through 2003, behind five districts in states along the southwestern border of the United States.[4]

Yet, I am compelled to examine more closely what makes such a huge disparity between the national median sentence and this District's median sentence happen, and, furthermore, whether such a disparity is acceptable. As to the cause of such a disparity, even if every judge in this District were to sentence every defendant at the top of the Guidelines range, the result would not be a doubling of the nationwide median sentence in this District. Some part of the high median sentence for drug-trafficking offenses in this District may be attributable to the higher-than-average number of drug-trafficking offenses involving methamphetamine in Iowa. Nevertheless, I believe that the high median sentence is substantially attributable to the policies of the United States Attorney's Office in this District. Those policies include charging and prosecuting the maximum possible drug quantities with very little leniency; making extraordinary use of information obtained from proffers by defendants pursuant to U.S.S.G. § 1B1.8; making low recommendations for substantial assistance departures, which in 2004, the year Saenz was originally

_____

[3] According to records in the United States Probation Office for the Northern District of Iowa, since my appointment as a United States District Court Judge, I have sentenced over 1,400 defendants. Across the nation, for fiscal year 2003, 37.4 percent of a federal district court judge's criminal docket was drug-related, but in the Northern District of Iowa, the figure was 67.5 percent. United States Sentencing Commission, Office of Policy Analysis, 2003 Datafile, OPAFY03, published at www.ussc.gov/JUDPACK/JP2003.htm.

[4] For 2004 and 2005, this District had the seventh highest criminal caseload per judge in the nation, behind the same five southwestern border districts and the District of Nebraska. *See* http://jnet.ao.dcn/Statistics/Federal_Court_Management_Statistics.html.

sentenced, averaged only 17.5 percent in cases in which I was the sentencing judge;[5] and limiting the sentencing judge's discretion in substantial assistance cases by making one or both substantial assistance motions on only one count against a defendant, but not on other counts, so that a mandatory minimum sentence applies to at least one count against a defendant, even if that defendant provided substantial assistance. Every visiting judge to come to this District for sentencings has commented on how unusual and unfair this last policy is. Thus, the reality is that, even in the post-*Blakely* and post-*Booker* federal sentencing scheme, most of the discretion to determine defendants' sentencing ranges lies with the charging and prosecuting authorities, the United States Attorneys, who determine the drug quantities on which sentences will be based, and when motions for substantial assistance reductions will be made, not with federal judges. I observe, further, that while federal judges, with lifetime appointments, are constrained by statute and standards of review to be fair and reasonable in sentencing, federal prosecutors, who are temporary political appointees, are too likely to have an agenda to be perceived to be "tough on crime." Thus, I would suggest that the shocking disparity between this District's and the nation's median sentences for drug-trafficking offenses is primarily attributable to the exercise of prosecutorial discretion.

I am not alone in this observation. In his concurring opinion in *United States v. Flores*, 336 F.3d 760 (8th Cir. 2003), Judge Bright opined as follows:

---

[5]Statistics provided by the United States Probation Office for the Northern District of Iowa, and presented during Saenz's resentencing hearing without objection from the government, showed that, in the year that Saenz was sentenced, 2004, the average recommended reduction for substantial assistance by the United States Attorney's Office for the Northern District of Iowa for the 36 cases involving such reductions in which I was the sentencing judge was only 17.5 percent.

> This court and every court ought to give due deference to the sentencing decisions of the district judge. However, the Sentencing Guidelines and other changes limit the discretion of the district judge. This does not mean that sentencing disparities have been eliminated or that injustice does not exist, because it does. What it has come to mean is that much of the discretion in sentencing decisions unfortunately falls to persons far less qualified to judge an offender than the district judge. While we say the district judge sentences the offender, in fact, the prosecutor, as I have shown in a number of opinions, often has more input into the sentence to be imposed than does the district judge.

*Flores*, 336 F.3d at 765-66 (Bright, J., concurring). Thus, the reality of the present sentencing scheme is that discretion has shifted from the sentencing judge to the prosecutor, which has resulted in, or at least substantially contributed to, disparities in sentences from district to district.

As to whether such a huge disparity between this District's median sentence for drug-trafficking offenses and the national median sentence for such offenses is acceptable, the goals of federal sentencing purportedly include imposition of sentences that are "sufficient, but not greater than necessary," and "avoid[ance of] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a). In my view, a District's median sentence that is twice the national median simply does not comport with these goals. It is, instead, an unacceptable disparity.[6]

---

[6]As explained, *supra* in note 2, the Northern District is one of only a handful of districts with an anomalously high median sentence. Although I have identified some of the policies of the United States Attorney's Office in this District that I believe contribute to this District's anomalously high median sentence, I have no information about the

(continued…)

Thus, what I believe must be scrutinized more carefully is not whether particular judges are excessively lenient in isolated cases, but whether the sentencing scheme places too much discretion in the hands of federal prosecutors, with the result that there are staggering disparities between median sentences for some Districts and the median sentence for the nation as a whole. At the very least, the "reasonableness" of a judge's substantial assistance departures and other sentencing decisions should be evaluated in the context of the realities of federal sentencing, including policies of the local United States Attorney's Office that create disparities between the median sentence in a particular district and the median sentence nationwide. I am puzzled by a sentencing scheme that appears to give far more deference to the exercise of discretion by prosecutors than to the exercise of discretion by experienced federal district court judges, where the latter are more likely than the former to have developed a sense of what is fair and reasonable in sentencing through their experience with hundreds of cases and their knowledge of nationwide practices.

### B.  Legal Standards For Substantial Assistance Departures

Let us be clear:  My difference with the recent string of reversals of my sentencing decisions is over the limited issue of what constitutes an "extraordinary" downward departure for substantial assistance, not what constitutes "reasonable" sentencing generally.  In the context of that narrow issue, I hasten to say, first, that I agree with the Circuit Court's analytical framework for determining whether and to what extent a downward departure for substantial assistance is appropriate.

---

[6](...continued)
policies of other United States Attorney's Offices that might contribute to the high median sentences in the handful of other anomalous districts.

*1.*     *Points of agreement*

Specifically, the now-advisory United States Sentencing Guidelines authorize a downward departure for "substantial assistance," as follows:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
>
>> (a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:
>>
>>> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>>>
>>> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>>>
>>> (3) the nature and extent of the defendant's assistance;
>>>
>>> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>>>
>>> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1. Similarly, 18 U.S.C. § 3553(e) provides a statutory authorization for a sentence "below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." However, this statutory provision, likewise, invokes the Guidelines factors, because it provides that "[s]uch sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission

pursuant to section 994 of title 28, United States Code." 18 U.S.C. § 3553(3). Based on this statutory language, the Eighth Circuit Court of Appeals has recognized that, whether the government's motion for a substantial assistance reduction is pursuant to § 5K1.1 or § 3553(e), "review of a reduction for substantial assistance typically centers on the non-exhaustive list of factors set forth in § 5K1.1, which the district court should consider in making its determination." *United States v. Saenz*, 428 F.3d 1159, 1162 (8th Cir. 2005) (noting that "the government moved to reduce the sentence under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), based on Saenz's provision of substantial assistance"); *see also United States v. Christenson*, 403 F.3d 1006, 1108 (8th Cir. 2005) (under the "advisory guidelines . . . substantial assistance departures are constrained by U.S.S.G. § 5K1.1," citing *Melendez v. United States*, 518 U.S. 120, 129 (1996)), *aff'd by an equally divided court*, 424 F.3d 852 (8th Cir. 2005) (*en banc*).

Furthermore, I cannot dispute, nor would I wish to, that the list of factors in § 5K1.1 is "non-exhaustive," but even so, "[t]he extent of a departure or reduction pursuant to § 5K1.1 or § 3553(e) 'can be based only on assistance-related considerations.'" *Id*. (quoting *United States v. Pepper*, 412 F.3d 995, 998 (8th Cir. 2005)). Having approached the calculation hundreds of times myself,[7] I also fervently agree with the Circuit Court that, even when a sentencing court considers only assistance-related factors, "[t]he appropriate degree of sentencing reduction cannot be calculated with 'mathematical

---

[7] Again, according to records in the United States Probation Office for the Northern District of Iowa, since my appointment as a United States District Court Judge, I have sentenced over 1,400 defendants. Although I have not asked the Probation Office to determine the precise number, some significant share of those sentencings involved substantial assistance motions.

precision.'" *Saenz*, 428 F.3d at 1164 (quoting *United States v. Haack*, 403 F.3d 997, 1005 (8th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S. Ct. 276 (2005)).

I also agree wholeheartedly with the Circuit Court's recent clarification of the meaning of one of the § 5K1.1 factors, which requires the sentencing court to "tak[e] into consideration the government's evaluation of the assistance rendered." U.S.S.G. § 5K1.1(a)(1). Assistant United States Attorneys in my district have persistently misconstrued this provision to require the sentencing court to give substantial weight to the government's recommendation concerning the *extent* of any downward departure. However, the Circuit Court has now consistently rejected such a construction, holding that, in determining whether and to what extent to depart, "[t]he government's recommendation [of the extent of the resulting departure] is not . . . controlling and ultimately the district court determines the appropriate reduction." *United States v. Burns*, ___ F.3d ___, ___, 2006 WL 345850, *3 (8th Cir. Feb. 16, 2006) (citing U.S.S.G. § 5K1.1(a) and *Haack*, 403 F.3d at 1005). More specifically still, the Circuit Court has recognized that there is a difference between the government's "evaluation" of the extent of the defendant's assistance, which is entitled to significant weight, and the government's "valuation" of that assistance, which is not, particularly where such "valuation" is inadequately explained. *Saenz*, 428 F.3d at 1164 (rejecting the government's assertion that the sentencing court's reduction was unreasonable because it "greatly exceeded that recommended by the United States Attorney," based on the distinction between "evaluation" and "valuation"); *Haack*, 403 F.3d at 1005 (rejecting the government's argument that the sentencing court did not take into consideration the government's recommendation concerning the extent of the appropriate departure, because a district court has the discretion to find that the government's recommended reduction does not fully compensate the defendant for the significance and usefulness of his assistance, and

because the government's recommendation is only a part of one of the five factors to be considered under § 5K1.1); *United States v. Pizano*, 403 F.3d 991, 995 (8th Cir. 2005) (the sentencing court properly rejected the government's recommendation regarding the extent of the departure where the sentencing court found that the government's recommendation did not take into consideration all pertinent factors). At the very least, the Circuit Court has explained, "'[a] recommendation by the government that does not adequately explain its reasoning is entitled to less weight . . . than a more fully explained recommendation.'" *Burns*, ___ F.3d at ___, 2006 WL 345850 at *3 (quoting *Haack*, 403 F.3d at 1005 n.2). I can only hope that the Circuit Court's clarity and consistency on this point will put an end to the routine practice by the United States Attorney's Office in this District of making ridiculously stingy recommendations concerning the extent to which the court should depart downward for a defendant's substantial assistance, with no explication of the basis for such recommendations, accompanied by unfounded assertions that the court must then give such recommendations substantial deference.

I also do not dispute for a moment that the Circuit Court is "charged with considering whether the extent of a reduction in the now-advisory guideline sentence or below the statutory mandatory sentence is 'reasonable,' and that [the appellate court] review[s] the district court's decision for abuse of discretion." *Saenz*, 428 F.3d at 1162 (citing *Dalton*, 404 F.3d at 1032); *accord United States v. Coyle*, 429 F.3d 1192, 1193 (8th Cir. 2005) (also citing *Dalton*). I also concur in the Circuit Court's position that the determination of whether the sentence ultimately resulting from a substantial assistance departure is "reasonable" should be "'guided by the sentencing factors listed in 18 U.S.C. § 3553(a).'" *Burns*, ___ F.3d at ___, 2006 WL 345850, *2 (quoting *United States v. Pizano*, 403 F.3d 991, 995 (8th Cir. 2005)); *Christenson*, 403 F.3d at 1009 (determining reasonableness of the sentence in light of the § 3553(a) factors); *see also Haack*, 403 F.3d

at 1002 ("[T]he sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)."). I would even go so far as to agree with the Circuit Court that "'[a]n extraordinary reduction must be supported by extraordinary circumstances.'" *Saenz*, 428 F.3d at 1162 (quoting *United States v. Dalton*, 404 F.3d 1029, 1033 (8th Cir. 2005)); *see also Coyle*, 429 F.3d at 1193 (also citing this proposition from *Dalton*).

Thus, it is not the general framework for substantial assistance downward departures that is my bone of contention.

### 2.    *The point of disagreement*

What I vigorously dispute is using 50 percent as an arbitrary benchmark for what constitutes an "unreasonable" and "extraordinary" reduction for substantial assistance. Specifically, in *United States v. Dalton*, 404 F.3d 1029 (8th Cir. 2005), in an attempt to support a holding that the 75 percent reduction that I had made in that case was "extraordinary," the Circuit Court cited *United States v. Enriquez*, 205 F.3d 345 (8th Cir.), *cert. denied*, 531 U.S. 890 (2000), as describing a 50 percent downward departure as "'an extraordinary sentence reduction.'" *Dalton*, 404 F.3d at 1033 (quoting *Enriquez*, 205 F.3d at 348). Thus, the decision in *Dalton* was the first to suggest that 50 percent is the benchmark for what constitutes an "extraordinary" reduction for substantial assistance. Subsequently, in the decision on appeal in this case, *United States v. Saenz*, 428 F.3d 1159 (8th Cir. 2005), the Circuit Court went a step further, apparently establishing a 50 percent downward departure for substantial assistance as *ipso facto* "extraordinary," by relying on the *Dalton* court's "favorabl[e] citation" of the "observation [in *Enriquez*] that a 50 percent downward departure was an 'extraordinary sentence reduction.'" *Saenz*, 428 F.3d at 1162 (quoting *Enriquez*, 205 F.3d at 348). In contrast, I believe that reliance on *Enriquez* for the proposition that 50 percent is the benchmark for an "extraordinary" substantial

assistance reduction is extraordinarily strained and, furthermore, that the basic proposition that a 50 percent reduction for substantial assistance is "extraordinary" is simply wrong.

### a. *The legal flaw*

First, the comment in *Enriquez* upon which the Circuit Court relied in *Dalton* and *Saenz* was not made in the context of a determination of whether a district court's downward departure for substantial assistance was "unreasonable" or "extraordinary." Instead, in *Enriquez*, the defendant argued "that he should be allowed to withdraw his plea because the government failed to keep an alleged promise to recommend an above-average sentence reduction for his wife." *Enriquez*, 205 F.3d at 348. The Circuit Court concluded that the district court had not erred in finding that there was no such promise. *Id*. Only then did the Circuit Court comment, apparently as an afterthought, that, "as a practical matter, Mrs. Enriquez actually did receive an extraordinary sentence reduction of 50 per cent., as opposed to the 20 per cent. expected." *Id*. I cannot believe that an off-hand statement, which is plainly *dicta* in the decision in which it appears, could possibly have been intended to establish the benchmark for what constitutes an "unreasonable" or "extraordinary" downward departure in the very different context of a reduction for substantial assistance. Certainly, there was no attempt in *Enriquez* (or indeed, in the subsequent decisions in *Dalton* and *Saenz*) to provide a reasoned basis for establishing a 50 percent reduction as the benchmark for "unreasonableness" of a reduction, whether the reduction is for substantial assistance or for any other reason. Moreover, to the extent that the court in *Enriquez* provided any basis for labeling a 50 percent reduction "extraordinary," the basis was that only a 20 percent reduction was "expected," and even then, there was no explanation of the basis on which only a 20 percent reduction was "expected." *Id*. Thus, the decision in *Enriquez* does not reasonably stand for the

proposition that a 50 percent reduction in sentence for any reason, let alone for substantial assistance, is "extraordinary."

### b.    *The factual flaw*

Whatever the basis for or purpose of the Circuit Court's observation in *Enriquez* that a 50 percent reduction in the defendant's wife's sentence was "extraordinary," the proposition that a 50 percent reduction *for substantial assistance* is "extraordinary" is demonstrably wrong. Even before statistics became available this winter from the United States Sentencing Commission, I was confident that a 50 percent reduction in substantial assistance cases was not extraordinary in terms of national practice by district court judges. Ever since my appointment as a United States District Court Judge in 1994, I have undertaken substantial inquiry of other district court judges I have met at various meetings and seminars, both within our Circuit and nationally, to find out what the sentencing practices were for substantial assistance motions in their respective districts. A substantial number have told me that a 50 percent reduction was not at all unusual, especially in those districts where the prosecutors do not make a specific recommendation to the sentencing judge regarding the extent of the departure. This inquiry expanded when I was appointed several years ago to the Defender Services Committee of the Judicial Conference of the United States, where I now have the opportunity to meet with all of the nation's Federal Public Defenders and learn first hand from the Federal Defender in each district what the substantial assistance policies are. Thus, the information I learned anecdotally over the past eleven years on the nature and extent of substantial assistance reductions was simply reinforced by recent data from the United States Sentencing Commission.

That data, embodied in the U.S. SENTENCING COMMISSION SPECIAL POST-BOOKER CODING PROJECT: INFORMATION FOR ALL CASES: DATA EXTRACTION AS OF FEBRUARY 1, 2006 (Feb. 14, 2006) (SPECIAL POST-BOOKER CODING PROJECT REPORT), clearly

establishes that a 50 percent benchmark for what is an "extraordinary" departure for substantial assistance is wholly without foundation. Instead, the SPECIAL POST-BOOKER CODING PROJECT REPORT shows that the "median percent decrease from guideline minimum" for 8,854 substantial assistance cases in all offense categories is 49.9 percent. SPECIAL POST-BOOKER CODING PROJECT REPORT, 19. Similarly, the REPORT shows that the "median percent decrease from guideline minimum" for 5,660 substantial assistance cases involving drug-trafficking offenses is 45.8 percent. *Id*. Thus, far from being "extraordinary," a 50 percent reduction for substantial assistance very nearly approximates "the median" and, as such, is actually and necessarily "ordinary."

## C. The Lessons From The Sentencing Report

### 1. The range of "ordinary" substantial assistance departures

In addition to debunking the notion that a 50 percent reduction for substantial assistance is "extraordinary" and, instead, demonstrating that such a reduction is actually "ordinary," the SPECIAL POST-BOOKER CODING PROJECT REPORT teaches us still more. Admittedly, the REPORT does not provide a further breakdown of substantial assistance reductions, for example, by percentage ranges (how many sentences were reduced by 0-9 percent, 10-19 percent, 20-29 percent, etc.), nor does it indicate the range of actual substantial assistance reductions (for example, from 5 percent to 85 percent, with no reductions in excess of 85 percent, or 30 percent to 99 percent, with no reductions less than 30 percent), which might fine-tune our understanding of what kind of reduction really is "ordinary" and what kind is "extraordinary." Nevertheless, three further observations can be made simply from the identification of the "median" substantial assistance reduction.

First, because the REPORT identifies the "median" reduction for substantial assistance, rather than the "mean" or "average," there must necessarily have been just as many such reductions *above* 50 percent as *below* 50 percent, not merely a few very large reductions off-setting much more numerous, but much smaller, supposedly "ordinary" reductions. Thus, if a 50 percent reduction for substantial assistance is the "median," it follows that reductions at the low end—such as the 10 or 15 percent reductions that are commonly recommended by the United States Attorney's Office in my district—must be recognized as "extraordinary," albeit, "extraordinarily low." Indeed, to reach the national median reduction for substantial assistance, I would have had to nearly triple the average recommendation of 17.5 percent by the United States Attorney's Office in this District in 2004, the year Saenz was originally sentenced, in the 36 such cases in which I was the sentencing judge.[8] Conversely, reductions at the high end, such as those exceeding 85 or 90 percent, must also be recognized as "extraordinary," but "extraordinarily high."

Second, because there were just as many substantial assistance reductions *above* 50 percent as *below* 50 percent, it follows that "ordinary" reductions fall within a range *around* 50 percent, perhaps from 40 percent to 60 percent, or even from 30 percent to 70 percent. The "median" reduction simply cannot be construed to be the demarcation between "ordinary" reductions and "extraordinary" reductions, with reductions below the "median" construed to be "ordinary" and those above the "median" construed to be "extraordinary."

Third, not only does the empirical evidence gathered by the Sentencing Commission establish that a 50 percent benchmark for what constitutes an "extraordinary" reduction

---

[8]I have no statistics concerning the average recommendation by the United States Attorney's Office for substantial assistance reductions in cases before other judges in this District in 2004.

for substantial assistance is simply wrong, that empirical evidence also demonstrates that using such an unsupported benchmark is contrary to the policy goal of "reduc[ing] unwarranted sentencing disparities," which is still valid after the demise of mandatory sentencing guidelines. *Saenz*, 428 F.3d at 1164 (noting that this goal remains part of "the structure and theory" of the guidelines and a matter of "statutory command"); 18 U.S.C. § 3553(a)(6) (identifying as a factor that shall be considered in the imposition of a sentence "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). This is so, because such a benchmark for "extraordinariness" is out of step with the reality of substantial assistance reductions nationwide.

## 2.   The "reasonableness" of "starting in the middle"

With the empirical evidence provided by the SPECIAL POST-BOOKER CODING PROJECT REPORT, I must go yet another step beyond rejection of a 50 percent benchmark for what constitutes an "extraordinary" reduction for substantial assistance. In my view, if a 50 (49.9) percent reduction is the "median" reduction for substantial assistance, then far from defining the outer fringes of appropriate reductions, 50 percent should be *the starting point* for any determination of how much to reduce a defendant's sentence based on substantial assistance.[9] To the extent that the defendant's assistance exceeds or fails

---

[9]There could be some argument that the "starting point" for substantial assistance should be the national median for such a reduction for the specific category of offense in question. However, here, the "offense-specific" national median reduction for substantial assistance in drug-trafficking cases, 45.8 percent, is sufficiently close to the "all offenses" national median reduction of 49.9 percent, *see* SPECIAL POST-BOOKER CODING PROJECT REPORT at 19, to make "the middle" a reasonable approximation of the appropriate starting point. *Cf. Saenz*, 428 F.3d at 1164 ("The appropriate degree of sentencing reduction cannot be calculated with 'mathematical precision.'") (quoting *Haack*, 403 F.3d at 1005).

to meet the "ordinary" level of assistance qualifying for a "substantial assistance" reduction, based on the court's weighing of the pertinent § 5K1.1 factors, the court should make a reduction that is either higher or lower than 50 percent.[10] In contrast, the Circuit Court seems to prefer either zero or the government's recommendation as the starting point, or at the very least, believes that the starting point must be considerably less than 50 percent, because the Circuit Court focuses on a benchmark of 50 percent as constituting the outer limit for an "ordinary" reduction. Again, the SPECIAL BOOKER CODING PROJECT REPORT shows that the Circuit Court's starting point relies on a faulty premise.

Moreover, even without regard to the *actual* median, nationwide, for substantial assistance reductions shown in the SPECIAL BOOKER CODING PROJECT REPORT, it seems to me that it is logical—and certainly "reasonable"—to begin the process of determining a defendant's reduction for substantial assistance "in the middle" of the defendant's Guidelines sentence. As noted above, a sentence within the Guidelines *range* is "presumptively reasonable." *See Myers*, ___ F.3d at ___, 2006 WL 488411 at *2. It

---

[10]The SPECIAL BOOKER CODING PROJECT REPORT identifies the median reduction for substantial assistance "from Guideline minimum." *See* SPECIAL BOOKER CODING PROJECT REPORT at 19. Thus, this statistic assumes that defendants who qualify for substantial assistance reductions would necessarily be sentenced at the bottom of their Guidelines range, in the absence of a substantial assistance reduction. That is not necessarily the case for defendants I sentence. Instead, I determine where I would otherwise sentence the defendant within the Guidelines range before I calculate any reduction for substantial assistance. Therefore, I have made substantial assistance reductions from the "middle" or even the "top" of the Guidelines range, for example, where a defendant was at the high end of criminal history points for his or her criminal history category, or where there were other factors that would have justified a Guidelines sentence at something other than the Guidelines minimum. Thus, a median departure for substantial assistance of 50 percent "from Guideline minimum" might actually be artificially low compared to the "real" percentage of departure from the otherwise applicable sentence within the Guidelines range.

follows that a sentence "in the middle" of the Guidelines range would necessarily be "presumptively reasonable," so that a sentencing judge could reasonably begin a determination of whether to increase or decrease a particular defendant's sentence from the "middle" of the Guidelines range based on the pertinent factors. Similarly, where the possible range of substantial assistance reductions is 0 percent to 100 percent of the Guidelines sentence, it is logical to begin "in the middle" of that range, with a 50 percent reduction. The sentencing judge would then increase or decrease the percentage for a particular defendant's substantial assistance reduction based on the sentencing court's evaluation of the pertinent assistance-related factors. To my mind, starting "in the middle" of the possible reductions to determine a substantial assistance reduction makes just as much sense as starting at the "bottom," with a 0 percent reduction, then increasing the percentage of reduction based on assistance-related factors found to be present, or starting at the "top," with a 100 percent reduction, then decreasing the percentage of reduction based on assistance-related factors found to be absent or only partially present.

I believe that a further, and independent, ground for beginning the calculation of a substantial assistance reduction at 50 percent is that it makes sense in comparison to a statutory sentencing scheme that doubles the mandatory minimum sentence based on a defendant's single prior felony drug conviction. 21 U.S.C. § 841(b) (imposing a ten-year mandatory minimum for a § 841(a) offense involving certain quantities of controlled substances, but "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment," and imposing doublings of lesser mandatory minimums for lesser quantities, based on a prior conviction for a felony drug offense). This doubling of the mandatory minimum sentence for a prior felony drug conviction applies, even if the prior felony drug conviction

is a state conviction that the charging state does not designate as a felony, *see* U.S.S.G. § 4B1.2, comment n.1, or is one for which the defendant received a suspended sentence and probation and, thus, was not considered a "final judgment" by the state. *See United States v. Slicer*, 361 F.3d 1085, 1087-88 (8th Cir.), *cert. denied*, 543 U.S. 914 (2004); *United States v. Ortega*, 150 F.3d 937, 948 (8th Cir. 1998), *cert. denied*, 525 U.S. 1087 (1999). Where a defendant's sentence can be doubled based on a prior drug conviction, with no other aggravating factors, and where that conviction is, in turn, more than likely the result of the defendant's addiction, it makes sense, in light of the factors set forth in 18 U.S.C. § 3553(a), and in terms of fairness, justice, mercy, to begin consideration of the appropriate reduction for a defendant's substantial assistance at half of the defendant's guideline sentence. This is so, in my view, because the policy goals of sentencing are at least as well served by halving a sentence for substantial assistance as they are by doubling a sentence for a single prior felony drug conviction.[11]

---

[11]An alternative, "objective" method for determining the extent of substantial assistance reductions suggested by the Seventh Circuit Court of Appeals and routinely employed by Judge Adelman of the Eastern District of Wisconsin also rejects any arbitrary percentage reduction as "extraordinary." As explained most recently by Judge Adelman, the Seventh Circuit Court of Appeals suggested that the sentencing judge award a 2-level adjustment for each § 5K1.1 factor found to be *fully* present. *See United States v. Samaras*, 390 F. Supp. 2d 805, 807 (E.D. Wis. 2005) (citing *United States v. Thomas*, 930 F.2d 526, 531 (7th Cir. 1991), *overruled on other grounds by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994), as suggesting this method and *United States v. Washington*, 293 F. Supp. 2d 930, 934 (E.D. Wis. 2003), as explaining Judge Adelman's application of this method). More specifically,

> [T]he approach suggested in *Thomas* seems to make the most
> sense in recognizing the need to quantify and link the departure
> to the guidelines, while still retaining flexibility. In *Thomas*,
> the court said:

(continued...)

23

[11] (...continued)

> The district court should examine the government's recommendation in light of factors like, but not limited to, those listed in § 5K1.1.(a).  As for the weight to accord such factors, the guideline provision that is most directly analogous to a downward departure for rendering substantial assistance is § 3E1.1, which authorizes a two-level reduction in the base offense level for acceptance of responsibility.  By way of negative inference, the two-level enhancement for obstruction of justice, § 3C1.1, may also be relevant.  These provisions suggest that departures based on a defendant's cooperation with authorities may warrant something on the order of a two-level adjustment for each factor found by the court to bear similarly on its evaluation of the defendant's cooperation.  They provide but imperfect guidance, however, since weighing the impact of any given factor on the quality of the defendant's cooperation is an imprecise art, at best.  We do not intend to preclude the district court from utilizing a scale with more gradations in order to assign greater or lesser weight to the factors it considers.

930 F.2d at 531; see also [United States v.] Winters, 117 F.3d [346,] 349-50 [(7th Cir. 1997)] (recognizing *Thomas* methodology, but noting that it is not mandatory).  By granting points for each § 5K1.1(a) factor found, the court is able to objectively quantify the assistance provided.  This will reduce unwarranted disparity, increase predictability, guide the court's exercise of discretion, and link the departure to the structure of the guidelines.

*Washington*, 293 F. Supp. 2d at 933-34 (footnote omitted).  Using this method in his published decisions, Judge Adelman has reduced prison sentences for substantial assistance from 35 to 100 percent.  *See Samaras*, 390 F. Supp. 2d at 808 (4-level reduction, resulting

(continued...)

### 3.	*Reorientation of perceptions*

In those decisions rejecting my substantial assistance reductions in excess of 50 percent as "extraordinary," the Circuit Court relied on three intertwined grounds, in addition to the erroneous postulate that a 50 percent reduction is "extraordinary." First, the Circuit Court found that I relied on too few of the § 5K1.1 factors in granting such "extraordinary" reductions. *See Saenz*, 428 F.3d at 1162-63 (finding that I improperly relied on "timeliness and truthfulness" as sufficient to justify a 68 percent reduction, because even "a strong showing in those areas" did not make reasonable "an extraordinary departure or reduction of more than 50 percent . . . without regard to the nature and extent

---

[11] (...continued)

in a 35 percent substantial assistance reduction from 46-57 months down to 30-37 months, with a further reduction to 18 months pursuant to § 3553(a)); *United States v. Page*, 2005 WL 2076710 (E.D. Wis. Aug. 25, 2005) (slip op.) (5-level reduction, resulting in a 50 percent reduction from 30-37 months down to 15-21 months, with a further reduction to 7 months pursuant to § 3553(a)); *United States v. Beamon*, 373 F. Supp. 2d 878 (E.D. Wis. 2005) (6-level reduction, resulting in a 58 percent substantial assistance reduction from 121-151 months down to 51-63 months); *United States v. Smith*, 359 F. Supp. 2d 771 (E.D. Wis. 2005) (10-level reduction, resulting in a 66 percent substantial assistance reduction from 121-151 months down to 41-51 months, with a further reduction to 18 months pursuant to § 3553(a)); *United States v. Willis*, 327 F. Supp. 2d 954 (E.D. Wis. 2004) (11-level reduction, resulting in a 100 percent reduction in prison time for substantial assistance, and an ultimate sentence of 6 months home confinement); *Washington*, 293 F. Supp. 2d at 935-36 (8-level reduction, resulting in a 58 percent substantial assistance reduction from 108-135 months down to 46-57 months). While this method nominally uses zero as the starting point for any reduction, it realistically starts the defendant at something considerably higher than zero, because a defendant who qualifies for a substantial assistance motion must have at least one of the § 5K1.1 factors weighing in his or her favor, and Judge Adelman's application of this method demonstrates that the results comport with what the SPECIAL POST-BOOKER CODING PROJECT REPORT shows to be "ordinary" reductions.

of the defendant's assistance, the significance and usefulness of the assistance, or any danger or risk of injury suffered by the cooperating defendant"). Second, the Circuit Court found that my "extraordinary" reductions left no room for larger reductions for defendants who provided even more "extraordinary" assistance. *See Coyle*, 429 F.3d at 1193-94 (rejecting a 73 percent reduction because "a reduction of this degree must be reserved for cooperating defendants who provide assistance that is much more extensive and significant than what Coyle offered," and commenting that "[t]here is a good deal of room between the government's modest recommendation [15 percent] and the district court's generous departure to recognize this defendant's assistance without at the same time skewing the degree of reduction that must be granted to future defendants whose performance on the continuum of substantial assistance deserves more credit than Coyle's"); *Saenz*, 428 F.3d at 1163 (rejecting a 68 percent reduction based on "timeliness and truthfulness" because "'[a] departure of this extent leaves little room for greater departures for defendants who actually [did more],'" quoting *Haack*, 403 F.3d at 1005-06). Third, the Circuit Court found that some cooperating defendants present "a close question" as to whether or not the government should file a substantial assistance motion at all, and if the government knows that "timely and truthful cooperation automatically justifies cutting a sentence in half when a motion is filed, then it is reasonable to expect that many of these borderline defendants will fail to qualify when the government makes a 'rational assessment of the cost and benefit that would flow from moving.'" *Saenz*, 428 F.3d at 1163 (quoting *Wade v. United States*, 504 U.S. 181, 187 (1992)). However, once a 50 percent benchmark for "extraordinary" reductions has been rejected—as it must be in light of the empirical evidence in the SPECIAL POST-BOOKER CODING PROJECT REPORT—these three grounds for rejecting several of my substantial assistance reductions

in excess of 50 percent also become untenable, and a reorientation of perceptions is required.

The first objection—that I relied on too few of the § 5K1.1 factors as a basis for large substantial assistance reductions, *see Saenz*, 428 F.3d at 1162-63—is troubling, because it suggests that all five factors must be present, or present in some relative proportions, to justify a reduction or, at least, a reduction in excess of what is deemed "ordinary," but § 5K1.1 says no such thing. Neither this guideline provision nor its accompanying application notes identify some hierarchy or relative weight among the enumerated factors or some requirement that all or some number of the enumerated factors be present before making any reduction, whether "ordinary" or "extraordinary." *Compare* U.S.S.G. § 5C1.2 ("safety valve" guideline requiring that all listed criteria be satisfied to disregard a statutory minimum sentence). In my view, § 5K1.1 and the accompanying application notes permit the sentencing judge to determine *which* of the enumerated factors, or other "assistance-related considerations," are present, *see Saenz*, 428 F.3d at 1162 (the list of factors in § 5K1.1 is "non-exclusive," but a substantial assistance departure "'can be based only on assistance-related considerations'") (quoting *Pepper*, 412 F.3d at 998), and then to determine the weight of the factors actually present to decide whether and how much to reduce a defendant's sentence. In other words, "extraordinary" "timeliness," U.S.S.G. § 5K1.1(a)(5), or "truthfulness," *id.* at (a)(2), either standing alone or in combination with other factors, might well be sufficient to justify an "extraordinary" departure. Indeed, I suggested in this defendant's original sentencing that "'any defendant who is timely, completely truthful, complete, reliable, and tells the government everything they need to know deserves more than 50 percent [reduction].'" *See Saenz*, 428 F.3d at 1162-63 (quoting my comments in the sentencing). This I still maintain, now that the assertion that a 50 percent reduction is somehow

"extraordinary" must be removed from the equation and replaced with recognition of the fact that a 50 percent reduction is essentially "ordinary," because the conduct I identified is, at the very least, entitled to an "ordinary" reduction within the range around the national median reduction of 49.9 percent, even if that conduct is not "extraordinary."

The second remaining objection—that reductions in excess of 50 percent, where only one or two of the § 5K1.1 factors are present, leave no room for larger reductions for defendants who have provided even more "extraordinary" assistance, *see Coyle*, 429 F.3d at 1193-94; *Saenz*, 428 F.3d at 1163; *Haack*, 403 F.3d at 1005-06—becomes equally untenable, once a 50 percent reduction, and indeed, a reduction in a range around 50 percent, is recognized as "ordinary." Undoubtedly, a defendant who actually participates in controlled buys, wears wires, gives grand jury and trial testimony, or is subjected to significant risk of injury or death to the defendant or his family is entitled to a larger reduction than a defendant who is merely "timely" and "truthful." *See, e.g., Saenz*, 428 F.3d at 1163 (quoting such factors identified in *Haack*, 403 F.3d at 1005-06). However, the question is where "room" for such a larger reduction should be found. In light of the evidence in the SPECIAL POST-BOOKER CODING PROJECT REPORT that a 50 percent reduction is essentially "ordinary," that "room" must be found well in excess of 50 percent, and indeed, well in excess of that part of the "ordinary" range that lies on the *high* side of 50 percent.

The problem with the third remaining objection—that United States Attorneys will have a disincentive to make substantial assistance motions in close cases, if some subset of § 5K1.1 factors is sufficient to warrant cutting a sentence in half, *Saenz*, 428 F.3d at 1163—likewise is that this objection is symptomatic of the misconception that a 50 percent reduction is "extraordinary." What is required is not a reorientation of sentencing judges' perceptions of what constitutes an "extraordinary" reduction, but a reorientation of United

States Attorneys' perceptions of what constitutes an "ordinary" reduction. The SPECIAL POST-BOOKER CODING PROJECT REPORT should make clear that an expectation that an "ordinary" reduction for substantial assistance should only be 10 to 15 percent is unfounded. Because criminal investigations and prosecutions are heavily reliant on substantial assistance from defendants already under arrest or indictment, the incentive to obtain the substantial assistance of such defendants will remain. In light of that incentive, the need to reward substantial assistance with motions for downward departures will also remain, even if United States Attorneys must now have a more realistic perception of what is an "ordinary" reduction based upon a "substantial assistance" motion.

Finally, in light of the reorientation of perceptions concerning what constitutes either an "ordinary" or an "extraordinary" reduction for substantial assistance in light of the SPECIAL POST-BOOKER CODING PROJECT REPORT, it becomes apparent that reductions in excess of 50 percent are more likely to comply with the mandates of 18 U.S.C. § 3553(a) than has sometimes been asserted. *Compare Burns*, ___ F.3d at ___, 2006 WL 345850 at *4 (finding that a 60 percent reduction comported with § 3553(a) sentencing objectives and considerations); *Christenson*, 403 F.3d at 1009 (finding that a 75 percent reduction comported with § 3553(a) sentencing objectives and considerations); *Pizano*, 403 F.3d at 996 (finding that a 75 percent reduction comported with § 3553(a) sentencing objectives and considerations); *with Coyle*, 429 F.3d at 1193-94 (while not expressly invoking § 3553(a), finding that a reduction of 73 percent was not appropriate, because to "avoid unwarranted sentencing disparities, defendants "offering a greater degree of assistance must receive reductions in the range of 80 to 100 percent"); *Saenz*, 428 F.3d at 1164 (finding a 68 percent reduction was not appropriate, also without expressly invoking § 3553(a), but finding that such a reduction was inappropriate, in part, in light of "the overall structure and theory of the guidelines, including the statutory command to

reduce unwarranted sentence disparities"); *Haack*, 403 F.3d at 1006 (expressly invoking § 3553(a) factors as a basis for rejecting an 85 percent reduction). For example, where a 50 percent reduction is the "median" for substantial assistance reductions, a reduction in excess of 50 percent is much more likely than one might have supposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and, not least, "to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

Therefore, in light of the SPECIAL POST-BOOKER CODING PROJECT REPORT, I believe that it is plain that a 50 percent reduction for substantial assistance is not "extraordinary," but "ordinary," and that, consequently, 50 percent should be the starting point for determination of the extent of a substantial assistance reduction in each case.

## II. SAENZ'S RESENTENCING

I must now turn to the question of the appropriate sentence in this case, upon remand from the Circuit Court, which found that my original 68 percent reduction in sentence for substantial assistance was "excessive" and "unreasonable." *See Saenz*, 428 F.3d at 1165. In order to determine the appropriate reduction and sentence upon remand, I must briefly summarize the background to the original sentence, the original sentence itself, the basis for the Circuit Court's reversal, and the evidence and arguments presented at the resentencing hearing on March 3, 2006.

### A. Background And Original Sentence

Saenz and her then-husband, Rudolph, were arrested after law enforcement officers discovered marijuana in two vans in a hotel parking lot in Onawa, Iowa. One van was parked in front of the room where Saenz and her husband were staying, and Saenz and her

husband admitted traveling in one of the vans. The couple staying in the room next to the Saenzes, Veronica Rodriguez-Cortez and Jose Rodriguez-Medrano, were also arrested. Law enforcement officers learned from this foursome that there was a third vehicle traveling with the group. That information led to the discovery of the third vehicle and the arrest of Christian Jimenez, who was a passenger in that vehicle. Rodriguez-Medrano, Rodriguez-Cortez, Rudolph Saenz, and Jimenez all eventually pleaded guilty to drug-trafficking offenses. Kim Saenz pleaded guilty to one count of conspiracy to distribute marijuana.

At Kim Saenz's original sentencing, the government moved for a reduction in her sentence for substantial assistance under both U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). According to the government, Saenz's cooperation consisted of talking to law enforcement officers about her co-conspirators on the same day that she was arrested; providing information within a day or two that assisted in preparing affidavits in support of criminal complaints; testifying at the sentencing hearing of Rodriguez-Medrano, where she corroborated testimony of Rodriguez-Cortez regarding the use of minors, including Kim Saenz's children, as passengers in the vehicles to avoid detection; and attempts to cooperate with Drug Enforcement Administration (DEA) agents in San Diego while on pre-trial release, including providing information used to procure one search warrant, although the information Saenz provided was outdated and the search pursuant to the warrant did not lead to any arrests or seizures.

The presentence investigation report recommended a sentencing range of 63 to 78 months of imprisonment under the then-mandatory United States Sentencing Guidelines, with a mandatory minimum sentence of 60 months. In light of Saenz's cooperation, however, the government recommended a 30 percent downward departure for substantial assistance to 44 months of imprisonment. I rejected the government's recommended

downward departure in this case, as in other cases, as "arbitrary and capricious and without any basis because [the government] fail[s] to disclose how [it] arrive[s] at [its] decisions." Original Sentencing Transcript at 17. Instead, I found that Saenz was "exceptionally timely" in her cooperation and that there was "no indication that she was anything but totally truthful, complete, and reliable and that she gave [the government] all the information she could." *Id.* at 16. Moreover, I expressed my view that "any defendant who is timely, completely truthful, complete, reliable, and tells the government everything they need to know deserves more than 50 percent" reduction. *Id.* at 17. Therefore, based on my evaluation of the pertinent factors set forth in U.S.S.G. § 5K1.1, I reduced Saenz's sentence by approximately 68 percent to 20 months of imprisonment.

## B. The Decision On Appeal

The government appealed my initial sentence, and a panel of the Eighth Circuit Court of Appeals reversed and remanded for resentencing. *See United States v. Saenz*, 428 F.3d 1159 (8th Cir. 2005). As explained above, the Circuit Court relied, in part, on the now discredited 50 percent benchmark for "extraordinariness" in substantial assistance reductions as a basis for reversing the reduction that I had made, *Saenz*, 428 F.3d at 1162, but also rejected the government's argument that the sentence that I had imposed was "unreasonable" because it varied from the government's recommended reduction. *Id.* at 1164. The Circuit Court summarized its reasons for rejecting the sentence that I had imposed, as follows:

> Our decision in this case . . . turns . . . on our independent conclusion that the degree of reduction is not reasonable in light of the evidence concerning the defendant's assistance, the factors set forth in § 5K1.1, and the overall structure and theory of the guidelines, including the statutory

command to reduce unwarranted sentence disparities. The appropriate degree of sentencing reduction cannot be calculated with "mathematical precision," *Haack*, 403 F.3d at 1005, and there is a range of reasonableness available to the district court in any given case. On this record, however, we conclude that the district court's analysis was flawed by its conclusion that timely and truthful cooperation always warrants a reduction of more than 50 percent, and that the degree of reduction was excessive and unreasonable under the circumstances of this case.

*Saenz*, 428 F.3d at 1164-65. Consequently, the Circuit Court vacated my judgment and remanded this case for resentencing consistent with its opinion. *Id.*

## C. Proceedings On Remand

### 1. Additional evidence

Pursuant to the remand from the Circuit Court, I held a resentencing hearing on March 3, 2006. The defendant—who has completed her original sentence, divorced Rudolph Saenz, remarried, and reverted to her maiden name of Kimberly Edwards—was personally present. I will refer to the defendant as Kimberly Edwards for the remainder of this ruling. Edwards now lives in California, so it was with considerable difficulty that she was accompanied by her three children, over whom she has regained custody; her new husband, for whom the Red Cross had procured emergency leave from the Army, even though he is currently posted to Fort Lewis, in Washington state, anticipating imminent deployment to Iraq; and her current employer, Liliana Riquer. Edwards and Ms. Riquer both testified at the resentencing hearing.

Edwards testified as to both her efforts to provide substantial assistance to the government prior to her original sentencing and as to her efforts to rehabilitate herself since completing her prison term. As to the extent of her assistance prior to her original

sentencing, Edwards testified that, while she was incarcerated in Iowa pending sentencing, she was released to go to California to assist DEA and border patrol agents. In addition to providing information for a search warrant there, Edwards testified that she actually led law enforcement officers to the house from which the drug-trafficking operation in which she was involved had been initiated, which law enforcement officers had previously been unable to locate. Edwards testified that she also provided information about cross-border drug activities and volunteered to go to Mexico to assist in an investigation of those activities, but that the government was unable to obtain the necessary "paperwork" to allow her to do so.

Edwards also testified that, while she was incarcerated in Iowa pending sentencing, she had been harassed and threatened by associates of her co-defendant, Veronica Rodriguez-Cortez, who was also incarcerated in the same jail. Such harassment and threats arose from the perception by Rodriguez-Cortez and her associates that Edwards was "a snitch." Specifically, Edwards testified that, after she had returned from California and was once again placed in presentence incarceration, she frequently overheard talking behind her back referring to her as a "snitch bitch." She also testified that she was subjected to various confrontations with Rodriguez-Cortez, because the prisoners were locked out of their two-person cells during the day and were forced to spend time as a group in "general population." After a "mediation" ordered by jail officials between Rodriguez-Cortez and Edwards, which was intended to defuse the tension between them, Edwards was involved in an "altercation" with two associates of Rodriguez-Cortez. Edwards also testified that jail officials intercepted correspondence or other communications from Rodriguez-Cortez in which Rodriguez-Cortez purportedly threatened Edwards's children. Edwards testified that, during the period that she was in general population, she suffered threats and harassment almost daily whenever she was locked out

of her cell.  After three weeks in general population, jail officials determined that Edwards was at risk from other inmates and placed her in protective segregation (solitary confinement).  Edwards remained in that status for the next six-and-one-half months until she began serving her sentence at a different facility.

Edwards also testified that, since completing her term of imprisonment, she has returned to California to live.  She testified that she found a job with a mortgage company performing accounting activities just days after checking into a halfway house in California, soon obtained leave to purchase a car and to move into an apartment, and shortly thereafter regained custody of her children.  She also testified that she remarried in November 2005, and intends to follow her husband to Washington state, where he is stationed as a private in the Army pending deployment to Iraq.  Both Edwards and her boss, Liliana Riquer, testified that, after she moves to Washington, Edwards will continue to work for her California employer "virtually," *i.e.*, via computer access to company files, because her employer considers her invaluable.  Also, Edwards testified that she has obtained another job in Washington and has enrolled in an on-line degree program to complete a bachelor's degree in accounting.

In addition to the testimony of Edwards and her employer, Edwards submitted as her Exhibit A various letters of support concerning the completeness of her rehabilitation. She also submitted into evidence as her Exhibit B the February 14, 2006, version of the SPECIAL POST-BOOKER CODING PROJECT REPORT, which had already come to the court's attention in the form of an earlier version, dated January 5, 2006.

The government did not dispute any of Edwards's testimony on March 3, 2006. However, the government did elicit from Edwards an admission that she had not raised during her original sentencing hearing the threats and harassment that she allegedly

suffered during presentence incarceration, although Edwards testified that she had told her attorney about it at that time. The government offered no additional evidence.

At the resentencing hearing, at my request, a United States Probation Officer also presented information concerning my sentencings, which I had asked the Probation Office to extract from its files. That information reflected that, in 2004, the year that Edwards was originally sentenced, I entertained 36 substantial assistance motions by the government, that the government's average recommended reduction pursuant to those motions was 17.5 percent, that the government's recommended reduction for Edwards was 30 percent, and that only 2 of the 36 recommendations by the government in cases before me in that year were in excess of 30 percent. The government was allowed to question the probation officer regarding this information, but did not elicit any further information about my sentencings or the government's recommendations in 2004 or any other year.

### 2.   *Arguments of the parties*

At the sentencing on March 3, 2006, the parties agreed that I could take the sentencing under advisement and subsequently enter this ruling. Although the government indicated at the hearing that it had no desire to submit any additional briefing, I nevertheless gave the government until March 8, 2006, to notify the defendant and me whether it did or did not intend to file any post-hearing brief. I advised the parties that, if the government did provide notice of its intent to file such a post-hearing brief after all, I would set a briefing schedule. The government did not notify me of its intent to file any supplemental brief prior to the March 8, 2006, deadline. However, on March 14, 2006, Edwards filed her Supplemental Brief In Support Of Sentencing Variance And Further Departure (docket no. 51). By order dated that same day (docket no. 52), I gave the government until March 21, 2006, to file any response to Edwards's Supplemental Brief.

The government filed both a response and an amended response to Edwards's Supplemental Brief on March 21, 2006 (docket nos. 53 & 54).

At the resentencing hearing, the parties agreed that Edwards's Guidelines sentencing range is 63 to 78 months and that I have the authority to vary downward to the 60-month mandatory minimum sentence before making any substantial assistance reduction, because the Guidelines are no longer mandatory. The government also reiterated its motions for substantial assistance reductions pursuant to both U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) and stood by its original recommendation of a 30 percent reduction in Edwards's sentence for substantial assistance.

I pressed the government to explain why its recommendation of a 30 percent reduction in this case was not "extraordinary," when the government had recommended reductions for substantial assistance in excess of 30 percent in only two other cases before me in the year that Edwards was originally sentenced. In a less than fully responsive answer, the government explained that its recommendations for substantial assistance reductions are based on a "continuum" from 0 to 50 percent, with recommendations in excess of 50 percent very rare,[12] and that the Eighth Circuit Court of Appeals has recognized that substantial assistance recommendations in excess of 50 percent are "extraordinary." The government also explained that it based the specific recommendation for a particular defendant within that continuum on a review of the § 5K1.1 factors. For example, the government explained that those defendants who provided assistance by doing undercover work, who experienced some danger, and who provided significant, useful

_____

[12]I concur in this observation about recommendations in this District. Although my memory may be less than perfect, during my 11½ years as a district court judge, I can recall only one recommendation by the government that was over 50 percent and only one at 50 percent.

testimony were at one end of the continuum, while those who provided merely corroborative information and who suffered no danger were at the other end. The government also asserted that Veronica Rodriguez-Cortez, Edwards's co-defendant, who received only a 21-month sentence, was not similarly situated to Edwards in all significant respects and that the government's dismissal of its appeal of the sentence in Rodriguez-Cortez's case, while pursuing the appeal in this case, was the decision of the Solicitor General.

The government's off-the-cuff reaction to evidence that the national median reduction for substantial assistance is 49.9 percent, according to the SPECIAL POST-BOOKER CODING PROJECT REPORT, was that each case is different and that different judges and different United States Attorney's Offices have different policies. The government also reiterated that the Eighth Circuit Court of Appeals has held that a 50 percent reduction for substantial assistance is presumptively unreasonable. Again, the court finds this reaction less than fully responsive to the issues raised by the SPECIAL POST-BOOKER CODING PROJECT REPORT. Finally, the government reiterated its position in its pre-hearing brief that post-sentence rehabilitation simply is not relevant to resentencing on remand of the original sentence, because only assistance-related grounds may be considered to justify the extent of a departure below the statutory minimum.

Edwards did not urge a specific percentage reduction for substantial assistance. However, she did argue that after her original pre-sentencing release and, indeed, before her plea, she had provided considerable assistance to DEA and border patrol agents in California. She also argued that, in addition to the evidence of the § 5K1.1 factors that had been presented at her original sentencing, she had now presented evidence that, while incarcerated before her original sentencing, she had suffered significant threats and intimidation, to herself and her children, as the result of the perception that she was

cooperating with authorities. She also made much of her efforts to rehabilitate herself completely, including her successful efforts to find and maintain stable employment immediately after release from prison; her successful efforts to regain custody of her children; her efforts to establish and maintain a stable home life for her children and her new husband, including her arrangements to move to Washington state to be near her husband's home base; and her continuing efforts to pursue further education and work opportunities. She argued that no purpose of sentencing would be served by returning her to prison for any additional time, but that such a return to prison would disrupt all of the positive steps that she has taken to rehabilitate herself and to establish a stable home life for her children. Based on the SPECIAL POST-BOOKER CODING PROJECT REPORT, Edwards also argued that a 50 percent reduction for substantial assistance can no longer be considered "extraordinary." Finally, she asserted that a sentence longer than 20 months would put her at variance with the 21 month sentence imposed upon her similarly-situated co-defendant, Veronica Rodriguez-Cortez, and that such a variance was unjust, where the government did not pursue its appeal of Rodriguez-Cortez's sentence.

In her post-hearing Supplemental Brief, Edwards asserted five arguments. First, she argued that the additional evidence that she provided during the resentencing hearing provides an additional permissible factor for departure under both § 5K1.1 and § 3553(e). Second, she argued that the resentencing court may grant departures and variances based upon post-original sentencing rehabilitation. Third, she argued that the resentencing court must consider § 3553(a) factors in addition to, and in spite of, the limited authority granted under § 3553(e) to depart below a statutory mandatory minimum based on substantial assistance. Fourth, she contended, based on the SPECIAL POST-BOOKER CODING PROJECT REPORT, that substantial assistance departures in excess of 50 percent are not unreasonable. Finally, she argued that she was similarly situated to her co-defendant, Veronica

Rodriguez-Cortez, in all essentials, so that no disparity between her sentence and her co-defendant's is appropriate.

In its amended response to Edwards's Supplemental Brief, the government first urged the court to ignore Edwards's self-serving testimony about the harassment that she had purportedly suffered while in jail pending her original sentencing, because Edwards had failed to present such information at her original sentencing. Next, the government asserted that Edwards was not similarly situated to co-defendant Rodriguez-Cortez, because that co-defendant had a different criminal history and different role in the drug conspiracy, for which Rodriguez-Cortez received a two-level increase. Thus, the government contended that there is no basis to find sentencing disparity between Edwards and a similarly-situated co-defendant. The government also asserted that a variance on the basis of Edwards's post-sentencing rehabilitation is inappropriate for several reasons, including that such a variance is prohibited under the now-advisory Guidelines; that Edwards had done no more than what is expected of every person convicted of a crime, which is thereafter to lead a law-abiding life; that Edwards should not benefit from the illegality of her original sentence, which may have given her an opportunity to demonstrate rehabilitation that is not available to other defendants; and that the Guidelines already take into consideration post-sentencing rehabilitation in the calculation of a Guidelines sentence. In essence, the government contends that Edwards's Guidelines sentence is presumptively reasonable, that sentences within the Guidelines range should be encouraged, and that there is no compelling justification for a variance from the Guidelines sentence in this case.

### D.  Determination Of Sentence

#### 1.    The appropriate procedure

As the Eighth Circuit Court of Appeals has now made clear, the post-*Booker* procedure for determination of a defendant's sentence involves the following steps: (1) the sentencing court begins with determination of the appropriate Guidelines sentencing range; (2) the sentencing court determines whether any traditional departures under the Sentencing Guidelines are appropriate; and (3) once the Guidelines sentence is determined, the sentencing court must consider all other factors set forth in 18 U.S.C. § 3553(a) to determine whether to impose the Guidelines sentence or a non-Guidelines sentence. *See, e.g., United States v. Rivera*, ___ F.3d ___, ___, 2006 WL 522156, *1 (8th Cir. Mar. 6, 2006) ("In *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005), we outlined the procedure a district court is to follow in imposing a post-*Booker* sentence.  First, the district court should determine the Guidelines sentencing range.  Second, the district court should determine whether any traditional departures are appropriate.  Third, the district court should apply all other section 3553(a) factors in determining whether to impose a Guidelines or non-Guidelines sentence."); *United States v. Burns*, ___ F.3d ___, ___, 2006 WL 345850, *2 (8th Cir. Feb. 16, 2006) ("At sentencing, a district court must determine the appropriate guideline sentencing range, including whether 'a traditional departure is appropriate under . . . the Federal Sentencing Guidelines.' *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir.), *cert. denied*, ___ U.S. ___, 126 S. Ct. 276, 163 L. Ed. 2d 246 (2005).  'Once the guidelines sentence is determined, the court shall then consider all other factors set forth in [18 U.S.C.] § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence.' *Id*. at 1003.").  The sentence ultimately imposed is reviewed for "reasonableness."  *Rivera*, ___ F.3d at ___, 2006 WL 522156 at *1.  While a Guidelines sentence enjoys a presumption of

reasonableness, a non-Guidelines sentence does not. *See United States v. Myers*, ___ F.3d ___, ___, 2006 WL 488411, *2 (8th Cir. Mar. 1, 2006) ("We have determined that a sentence imposed within the guidelines range is presumptively reasonable. *United States v. Cawthorn*, 429 F.3d 793, 802 (8th Cir. 2005). While it does not follow that a sentence outside the guidelines range is unreasonable, we review a district court's decision to depart from the appropriate guidelines range for abuse of discretion. *United States v. Haack*, 403 F.3d 997, 1003 (8th Cir.), *cert. denied*, ___ U.S. ___, 126 S. Ct. 276, 163 L. Ed. 2d 246 (2005)."). Upon resentencing after remand, the court is required to "resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals," except that the court must use the Guidelines in effect at the time of the original sentencing, and ordinarily must not impose a sentence outside of the applicable Guidelines range unless the court of appeals held, in remanding the case, that a certain ground was a permissible one for departure. 18 U.S.C. § 3742(g).

### 2. *Determination of the Guidelines sentence*

As to the first step in the sentencing process, I find that there is no dispute that Edwards's Guidelines sentencing range, under the Guidelines applicable at the time of her original sentencing, is 63 to 78 months. *See, e.g., Rivera*, ___ F.3d at ___, 2006 WL 522156 at *1 (the sentencing court must first determine the guidelines sentencing range). The more difficult step in the calculation here is determination of what, if any, traditional departures from the Guidelines are appropriate in this case. *See id.* (identifying this determination as the second step in the sentencing process). The focus of that determination, quite obviously, is the appropriate extent of a departure for Edwards's substantial assistance, where the Circuit Court held that a substantial assistance departure was permissible, but that the extent of my original departure on that ground was not. *See* 18 U.S.C. § 3742(g)(2)(B) (the court on resentencing must not impose a sentence outside

of the Guidelines range except where the court of appeals held, in remanding the case, that a ground was a permissible one for departure).

As explained above, in more detail, the determination of whether and to what extent to depart downward for substantial assistance, pursuant to either U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e)—and the government has made substantial assistance motions pursuant to both provisions here—"centers on the non-exhaustive list of factors set forth in § 5K1.1, which the district court should consider in making its determination." *Saenz*, 428 F.3d at 1162. I originally determined that Edwards was "exceptionally timely" in her cooperation and that there was "no indication that she was anything but totally truthful, complete, and reliable and that she gave [the government] all the information she could." Original Sentencing Transcript at 16. Moreover, I expressed my view that "any defendant who is timely, completely truthful, complete, reliable, and tells the government everything they need to know deserves more than 50 percent" reduction. *Id.* at 17. In other words, I found that Edwards had fully satisfied U.S.S.G. § 5K1.1(a)(2) and (5), indeed, that she had done so to an exceptional degree. As I explained above, so I still maintain.

However, I am now constrained by the Circuit Court's conclusion in this case that my determination was "flawed," at least to the extent that the Circuit Court based that conclusion on its determination that Edwards's "timeliness" and "truthfulness" were *not* "extraordinary." *Saenz*, 428 F.3d at 1165. In contrast, I do not believe that I am constrained by the Circuit Court's determination that a 50 percent reduction is the benchmark for an "extraordinary" substantial assistance reduction. As I have been at great pains to explain above, the Circuit Court did not have the benefit of the SPECIAL POST-BOOKER CODING PROJECT REPORT, but that REPORT plainly shows that a 50 percent reduction for substantial assistance is, in fact, "ordinary." SPECIAL POST-BOOKER CODING PROJECT REPORT at 19. Again, in light of the SPECIAL POST-BOOKER CODING PROJECT

REPORT, the Circuit Court's determination that a 50 percent reduction is inappropriate for "ordinary" "timeliness" and "truthfulness" is at odds with objective facts collected by the United States Sentencing Commission, which show that "ordinary" substantial assistance engenders a reduction in the range on either side of the national median reduction of 49.9 percent. Thus, I find that Edwards's "timeliness" and "truthfulness," while purportedly only "ordinary," are nevertheless sufficient to justify a substantial assistance reduction within the "ordinary" range for such reductions. Consequently, I will begin my consideration of the full extent of the substantial assistance departure for Edwards "in the middle" of her minimum Guidelines sentence, with a minimum reduction of 50 percent from 63 months.

The Circuit Court also found that, "while [Edwards's] assistance is reasonably viewed as 'substantial,' the nature and extent of her assistance was relatively limited, the significance and usefulness of her assistance is relatively modest, and she suffered no apparent danger or risk of injury." *Saenz*, 428 F.3d at 1163. Assuming that these determinations were correct on the record from Edwards's original sentencing—as I must assume on remand, whatever my personal view of that record—the record on remand is different in pertinent respects. Specifically, I find credible Edwards's testimony that, while she was incarcerated prior to her original sentencing, she was harassed and threatened, even subjected to physical violence, and that her children were threatened, all because Veronica Rodriguez-Cortez and her associates believed that Edwards had cooperated or was cooperating with law enforcement authorities. I find that the harassment, threats, and violence were sufficient, first, that jail officials had to enforce a "mediation" between Edwards and Rodriguez-Cortez, and second, that when mediation was insufficient to defuse the situation, jail officials had to remove Edwards from general population. In short, on the basis of the record on resentencing, I find that Edwards has

also fully satisfied U.S.S.G. § 5K1.1(a)(4), which authorizes the court to consider "any injury suffered, or any danger or risk of injury to the defendant or [her] family resulting from [her] assistance." I must also point out that, based on my experience with literally hundreds of substantial assistance motions in the Northern District of Iowa, cases in which a defendant actually suffers such injury, a danger or risk of injury, or threats, either to herself or her family, as the result of her substantial assistance, are exceedingly rare.

Moreover, the evidence presented at Edwards's resentencing firmly establishes that the government also found Edwards's assistance to be "extraordinary," even though the government is reluctant to ascribe such a term to her assistance. The proof is in the government's conduct, not merely its words. The government stood by its previous recommendation that Edwards should receive a 30 percent reduction for substantial assistance. The United States Probation Office for the Northern District of Iowa presented at the resentencing hearing, without objection or impeachment by the government, evidence that, in the year that Edwards was originally sentenced, 2004, the government made only 2 of 36 recommendations for substantial assistance reductions in cases before me in excess of 30 percent, and that the government's average recommendation in cases before me was only 17.5 percent. Thus, even on the "continuum" that the United States Attorney's Office for the Northern District of Iowa purportedly uses to determine its recommendation, its own recommendation of an unusually high substantial assistance departure establishes that this is an "extraordinary" case, even in the government's evaluation. Also, the government made its recommendation for an "extraordinary" reduction, even though the United States Attorney's Office was apparently ignorant of the extent to which Edwards had been harassed and threatened because of her cooperation with authorities. Such an evaluation of Edwards's assistance as "extraordinary" concurs with my own. In other words, I now find that Edwards has also fully satisfied U.S.S.G.

§ 5K1.1(a)(1), which authorizes the court to consider "the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered."

Thus, because the record now shows that Edwards has fully satisfied four of the five factors identified in § 5K1.1—specifically, § 5K1.1(a)(1) (court's and government's evaluation of significance and usefulness of assistance), (2) (truthfulness, completeness, and reliability), (4) (injury or danger), and (5) (timeliness)—I find that the record on resentencing firmly establishes that Edwards's substantial assistance was "extraordinary" and that she is, therefore, entitled to an "extraordinary" downward departure for substantial assistance.

The Circuit Court found that a reduction of 68 percent, from 63 months to 20 months, was not justified where that court could find no "extraordinary" assistance on the original record and mistakenly believed that 50 percent was the benchmark for "extraordinary" reductions. In contrast, I find that a reduction of 68 percent, from 63 months to 20 months, is entirely appropriate, where the record now firmly establishes that Edwards's assistance was "extraordinary," even assuming that 50 percent is the benchmark for an "extraordinary" substantial assistance reduction. I find, further, that a 68 percent reduction is even more appropriate for Edwards's "extraordinary" substantial assistance, where 50 percent can no longer be considered the benchmark for an "extraordinary" substantial assistance motion, in light of the SPECIAL POST-BOOKER CODING PROJECT REPORT, and a 68 percent reduction falls only somewhat outside of the "ordinary" range for substantial assistance reductions that necessarily lies on either side of the national median reduction of 49.9 percent.

### 3.    *"Reasonableness" of the Guidelines sentence*

As the last step in the determination of a Guidelines sentence, I must consider whether the 20 month sentence resulting from my substantial assistance departure is "reasonable" in light of 18 U.S.C. § 3553(a). *See Burns*, ___ F.3d at ___, 2006 WL 345850, *2 (determination of whether the sentence ultimately resulting from a substantial assistance departure is "reasonable" should be "'guided by the sentencing factors listed in 18 U.S.C. § 3553(a)'") (quoting *Pizano*, 403 F.3d at 995); *Christenson*, 403 F.3d at 1009 (determining reasonableness of the sentence in light of the § 3553(a) factors); *Haack*, 403 F.3d at 1002 ("[T]he sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)."). I find that a sentence of 20 months is, indeed, reasonable, in light of the § 3553(a) factors.

More specifically, I find that a 20 month sentence is "sufficient," and "not greater than necessary," in light of "the nature and circumstances of the offense and the history and characteristics of the defendant," *see* 18 U.S.C. § 3553(a)(1), where the defendant plainly recognized the consequences of her actions at the time of the original sentencing, and her conduct prior to her original sentencing had shown that she had an extraordinary willingness to attempt to cooperate and to rehabilitate herself. I also find that a sentence of 20 months is "sufficient," and "not greater than necessary," "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), and "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), that is, defendants who provide the sort of "extraordinary" substantial assistance that I find here.

Therefore, upon resentencing, I impose a Guidelines sentence of 20 months, with credit for time served.[13]

### 4.    Consideration of a non-Guidelines sentence

As the final step in my determination of Edwards's sentence, I am required to consider whether or not to impose a non-Guidelines sentence. *See, e.g., Rivera*, ___ F.3d at ___, 2006 WL 522156 at *1 (once the guidelines sentence is determined, the sentencing court shall consider all other factors set forth in 18 U.S.C. § 3553(a) to determine whether to impose the guidelines sentence or a non-guidelines sentence).  However, having found the Guidelines sentence, as determined above, to be reasonable in light of the factors enumerated in § 3553(a), I find it unnecessary to impose a non-Guidelines sentence, even in the alternative.

---

[13]In its decision on appeal of the original sentence in this case, the Circuit Court left open the question of "whether or to what extent the advisory guideline scheme announced in *Booker* and the authority of a district court to vary from the advisory guideline range based on the factors listed in 18 U.S.C. § 3553(a) is applicable when a district court acts pursuant to its limited authority under 18 U.S.C. § 3553(e) to sentence a defendant below a level established by statute 'so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.'"  *Saenz*, 428 F.3d at 1165 n.2 (quoting 18 U.S.C. § 3553(e)).  It is my understanding from the prosecutor in this case that the Circuit Court is currently entertaining appeals presenting the issue of whether § 3553(a) permits the court to vary below a mandatory minimum sentence when the government has made a motion for substantial assistance pursuant to § 3553(e).  Therefore, I will also leave this question open, because the Circuit Court is likely to resolve it, and I find it unnecessary to address it in the circumstances of this case.

### III.  CONCLUSION

Upon the foregoing, following remand from the Eighth Circuit Court of Appeals, I sentence defendant Kim Darby Saenz, now known as Kimberly Edwards, to 20 months imprisonment on Count 1 of the Information, with credit for time served.  The additional terms and conditions imposed in the June 9, 2004, judgment in this case shall remain in full force and effect.

**IT IS SO ORDERED.**

**DATED** this 23rd day of March, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA